UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

---

EBONY GILBERT                                     CIVIL ACTION NO. 19-0496

VERSUS                                            JUDGE DONALD E. WALTER

THE KROGER CO.                                    MAGISTRATE JUDGE HORNSBY

---

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment filed by Defendant, Kroger Texas, L.P. ("Kroger"). See Record Document 16. Plaintiff, Ebony Gilbert ("Gilbert"), opposes the motion. See Record Document 18. For the reasons assigned herein, Kroger's motion is hereby **GRANTED**.

BACKGROUND INFORMATION

Gilbert claims that Kroger engaged in discrimination and retaliation against her in violation of the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), and the Louisiana Employment Discrimination Law ("LEDL"), La. Rev. Stat. § 23:342. See Record Document 1. Gilbert is a former employee of Kroger Store 533 in Shreveport, Louisiana, where she was assigned to work in the meat/seafood department. See id. at ¶4; Record Document 16-2 at ¶3. She began her employment with Kroger on October 10, 2016, and was terminated from that position approximately one year later on October 13, 2017. See Record Document 16-2 at ¶4; Record Document 1 at ¶4; Record Document 16-8.

In the spring of 2017, Gilbert and two of her coworkers in the meat/seafood department, Veronica and Porkeshia, began to have interpersonal problems. Gilbert's niece had begun a romantic relationship with Veronica's boyfriend. See Record Document 16-4 (herein "Gilbert Dep.") at 35. Veronica and Porkeshia were upset with Gilbert's refusal to interfere with her

niece's relationship with Veronica's boyfriend. See id. at 39. This resulted in an extremely strained workplace between all three women. Gilbert testified that Veronica and Porkeshia threatened her with violence. See id. at 36. Both Veronica and Porkeshia filed official complaints with Kroger against Gilbert alleging that Gilbert was creating a hostile work environment. See id. Gilbert testified that Veronica and Porkeshia filed complaints against her after she filed complaints against them. See id. at 35.

Management attempted to address the conflict between the three women, and met with each to hear her complaints. See Record Document 16-6, Ex. C.[1] The store manager, John McNeil ("McNeil"), described the situation between the three women as an "ongoing feud" that had turned into "a circus" within the seafood department. See Record Document 18-4 (herein "McNeil Dep.") at 40-41. When management's efforts were unsuccessful, Cindy Joice ("Joice"), Kroger's District 9 Human Resources Manager, was called in to address the situation. See id. Joice visited with each of the women along with Barry Underwood ("Underwood"), their union representative. See Record Document 16-6, Ex. C; Record Document 18-3 (herein "Joice Dep.") at 16. Joice testified that during the meeting the women were arguing back and forth with each other and the situation was getting out of hand, which prompted her to tell the women: "this is a business; this is not a Jerry Springer show." See Joice Dep. at 17. Joice informed the women that if they did not stop their behavior, the next step would be the implementation of Kroger's progressive discipline policy. See Record Document 16-6. Gilbert testified that Joice made all three women agree that they would "squash the beef and there was going to be no more." See Gilbert Dep. at 50-53.

---

[1] Gilbert testified that Kroger did nothing to remedy the situation until things became serious, which included a threat by Veronica to cut Gilbert's head off, and a threat by Gilbert against Kroger. See Gilbert Dep. at 48. Gilbert did not indicate what type of threat she made towards Kroger, and Kroger provided no evidence of the threat to the Court.

2

On April 6, 2017, Gilbert signed and acknowledged her receipt and understanding of Kroger's Workplace Violence Policy. See Record Document 16-7 at 3-4; Gilbert Dep. at 50-53.[2] The policy prohibited all threatening or intimidating behavior and acts of harassment. See Record Document 16-7 at 3-4. By signing the policy, Gilbert acknowledged that violating the policy could result in disciplinary action up to and including termination. See id. Gilbert testified that when she signed the policy she understood that it would be her last warning and disciplinary action would be taken in the future. See Gilbert Dep. at 53.

Both Veronica and Porkeshia requested transfers to another Kroger location because they could no longer work with Gilbert. See Record Document 16-2 at ¶14; Joice Dep. at 18-19. Veronica was moved to a different store. See Gilbert Dep. at 80. Kroger was in the process of moving Porkeshia to a different store when she was injured in an auto accident. See id.

During the summer of 2017, Gilbert learned that she was pregnant. See Record Document 16-2 at ¶36. Gilbert alleges that her pregnancy was high risk, which prompted her to request light duty work. See id. at ¶38. Gilbert claims that Kroger repeatedly failed to provide her with a reasonable accommodation for her pregnancy. Gilbert maintains that despite her submission of a doctor's note restricting her from lifting heavy items, Kroger continued to require her to lift heavy silver pans out of the seafood counter for cleaning. See Record Document 1 at ¶¶6-22.[3]

Gilbert states that around July 14 or 15, 2017, she asked several different Kroger employees including Jeremy, an assistant store manager, Matt, the meat and seafood manager,

---

[2] Joice testified that all three women were required to sign Kroger's Workplace Violence Policy. See Joice Dep. at 15-16.

[3] McNeil testified that the silver pans were lifted out of the seafood case and cleaned approximately once a week. See McNeil Dep. at 23.

and Darlene McCall ("McCall"), the human resources manager, to excuse her from lifting the silver pans for cleaning and to change her schedule. See Gilbert Dep. at 93-94. Gilbert testified that McCall requested that she bring her a doctor's note. See id. at 94. The first doctor's note provided by Gilbert states: "Please allow patient to have light duty and no heavy lifting and don't allow the patient to close at night. Thank you." See Record Document 16-9.[4] Although the note was originally undated, Gilbert testified that she later clarified with the doctor's office that it was written on August 9, 2017. See Gilbert Dep. at 107. Gilbert states that she provided a copy of this note to several people including McNeil and McCall on August 10, 2017. See id. at 108-109. Gilbert maintains that despite providing the note, McCall still required her to lift the heavy silver pans for cleaning and work the late shift. See id. at 96.[5] Gilbert alleges that she injured her back when she lifted a silver pan on September 11, 2017, after she submitted her first doctor's note. See Record Document 1 at ¶17. She states that her injury required her to seek medical care and she did not return to work until September 20, 2017. See id. at ¶19. Gilbert also testified that McCall later wrote a note that said: "Ebony knows to clean under the silver pans." See Gilbert Dep. at 97.[6]

Gilbert also testified that McCall made a comment that she considered discriminatory. She stated that McCall told her that she used to be a good worker, but she should go ahead and quit and take care of her family so she wouldn't have to stress about coming into work during a

---

[4] During her deposition Gilbert agreed that the phrase "no heavy lifting" is subjective and does not provide a specific weight restriction. See Gilbert Dep. at 133.

[5] The Court notes that there is no evidence in the record of the actual weight of the silver pans, although Gilbert testified that she thought the pans weighed more than 25 pounds. See Gilbert Dep. at 96-97.

[6] Gilbert's deposition suggests that she revealed a copy of the note during her deposition, but it was unsigned. See Gilbert Dep. at 99. Gilbert indicated that she would provide the original note with McCall's signature to her attorney. See id. Gilbert did not provide a copy of the note to the Court in opposition to summary judgment.

4

high-risk pregnancy. See id. at 99-100. Gilbert also stated that around August 6, 2017, McNeil commented on her pregnancy by asking her when she planned on quitting her job. See id. at 101. She also testified that when she requested maternity leave McNeil told her that she needed to work to be paid. See id.[7]

On September 22, 2017, when Gilbert returned to work after taking time off for her back injury, she provided a second doctor's note to Kroger management. See Record Document 16-2 at ¶39; Record Document 16-9.[8] The note, dated September 13, 2017, states: "It is my medical opinion that Ebony Gilbert may return to work on 09/20/2017 with the following restrictions: Ms. Gilbert may not lift anything over 15 lbs." See Record Document 16-9 at 3. Gilbert testified that she provided a copy of the note to every manager working at Kroger that day, including McNeil and McCall. See Gilbert Dep. at 114-115. After the second note was submitted, Gilbert's schedule was changed and she was no longer scheduled to close the store, which was recommended in the original doctor's note. See Joice Dep. at 58.[9] Although the exact date of the schedule change is unclear from the record, the testimony indicates that it occurred sometime in late September or early October, after the second doctor's note was provided. See McNeil Dep. at 25; Gilbert Dep. at 144-145.

---

[7] There is no indication in the record as to whether Kroger offers paid maternity leave to its employees as a benefit.

[8] The Court notes that Gilbert testified that she requested a second note from her doctor after Joice requested that she do so during their meeting shortly before her termination on October 13. However, this testimony contradicts the written evidence in the record. The second note is dated September 13, 2017, exactly one month before Gilbert's termination. See Record Document 16-9.

[9] Kroger employees are part of a union, and shifts are assigned based on seniority with the more senior employees receiving the more desirable shifts. See McNeil Dep. at 26. By offering Gilbert an altered schedule she was moved into a spot ahead of more senior individuals. See id. at 25.

5

On or about October 10, 2017, Joice met with Gilbert along with McNeil[10] and McCall. See Joice Dep. at 24. Joice testified that she set up the meeting after Gilbert requested a meeting via Kroger's ethics point line. See id. at 47.[11] At the time of the meeting, Gilbert's schedule had already been changed so that Gilbert was not working the closing shift. See id. at 58. However, Gilbert's issue with cleaning the silver pans was discussed. See id. at 25-26. Joice testified that she did not recall discussing any issues with Gilbert's disciplinary history during the meeting. See id. at 47. Likewise, Gilbert testified that the meeting did not address any alleged misconduct on her part. See Gilbert Dep. 147.[12]

On October 3, 2017, a few days before her meeting with Joice, Gilbert had what Kroger describes as a "violent altercation" with her coworker Jacob Echols ("Echols"). See Record Document 16-1 at 9. Lachaie Richardson ("Richardson"), another seafood employee who witnessed the event, reported that "out of the blue" Gilbert asked Echols "what the f*ck you looking at" and then called Echols a "racist" and a "dumbass autism motherf*ucker." See

---

[10] McNeil testified that he got up and left the meeting because Gilbert kept speaking over him. See McNeil Dep. at 57.

[11] Gilbert submitted an unauthenticated document with her opposition to summary judgment that appears to be internal records from Kroger's ethics point line. See Record Document 18-8. Kroger did not object to the document. The document reflects that Joice "met with Gilbert again at her request because [Gilbert] called [her] crying." See id. at 7.

[12] The unauthenticated document contains a statement by Gilbert that the meeting was not productive, and that McNeil "stormed out" of the meeting because he was upset. See Record Document 18-8 at 6. The document also includes a statement by Joice wherein she described the October 10, 2017 meeting as follows: "she [Gilbert] took control of the meeting refusing to let anyone else talk, smiling the entire time she was telling us she was recording the conversation and that she had been recording all of the conversations with all of us. She also said that she had been calling her lawyer several times per day. She was twisting several pieces of information to her favor. She claims to have hired a lawyer and filed an EEOC suit. The store has not received anything on that yet." See id. at 7. No recording of the meeting has been provided to the Court.

6

Record Document 16-7 at 9.[13] Richardson also reported that Echols had an anxiety attack, ran to the bathroom, and seemed to be afraid of Gilbert when he returned. See id. Echols provided a statement to Kroger wherein he indicated that Gilbert made fun of him for having Asperger's syndrome, and when he tried to defend himself, Gilbert called him a "racist" in front of customers. See id. at 10-11. Gilbert admitted that she and Echols did have an altercation, but she denied calling Echols a "dumbass autism motherf*cker." See Gilbert Dep. at 65. She testified that the altercation occurred because Echols was talking disparagingly about African-Americans and Mexicans, and he called her "ghetto." See id. at 62, 66.

Additionally, Kroger maintains that on October 7, 2017, Gilbert made a violent gesture towards another coworker, Jimmy Ratcliff ("Ratliff"). Ratcliff reported that on that day he was walking down a hallway and encountered Gilbert standing by a computer. See Record Document 16-7 at 7. He stated that "all of a sudden" she made a "double fist at me and lunges at me while saying 'f*ck you.'" See id. Gilbert admitted that she made the hand gesture towards Ratcliff, but testified that the altercation occurred two or three months earlier because Ratcliff pushed a trashcan towards her and it hit her in the stomach. See Gilbert Dep. at 68-70.[14] When asked during her deposition why store surveillance video of her making the double-fisted gesture

---

[13] Gilbert testified that Richardson had warned her that Echols was trying to provoke her on purpose, so she "handled the situation good []." See Gilbert Dep. at 66. However, Gilbert also stated that she later recorded an altercation she had with Richardson because Richardson was "playing both sides" of the situation. See id. A recording of this conversation was not provided to the Court.

[14] Gilbert testified that she informed a Kroger manager about the trashcan incident and he reviewed the video footage, but the manager told her that Ratcliff could have pushed the trashcan towards her by accident. See Gilbert Dep. at 60. Gilbert testified that the manager "talked [her] down" and she "let it go." See id. She also said that Ratcliff apologized to her and they have been "fine ever since." See id. Gilbert also stated that she had the incident "put in her files" and "they witnessed what happened and they signed it." See id. at 61. No documents related to the trashcan incident were provided to the Court.

towards Ratcliff was dated October 7, Gilbert suggested that the date stamp is wrong. See id. at 89. McNeil testified that after he reviewed the video he called Joice, and she recommended that he suspend Gilbert pending the possibility of termination due to gross misconduct. See McNeil Dep. at 40.

On October 13, 2017, there was a meeting between McNeil and Gilbert during which Kroger issued Gilbert a Constructive Advice Record and informed her that she was being suspended pending an investigation. See Record Document 16-7 at 2.[15] Gilbert was told that her suspension was due to "gross misconduct/workplace violence." See id.[16] When presented with the Constructive Advice Record, Gilbert refused to sign the form. See id.; Gilbert Dep. at 85. Gilbert then left the room while cursing at McNeil. See Gilbert Dep. at 78. Another Kroger employee provided a statement that he witnessed Gilbert cursing McNeil and telling him to go "f*ck himself." See Record Document 16-7 at 6.[17] Gilbert admitted in her deposition that she made the statement to McNeil to go "f*ck himself." See Gilbert Dep. at 78. A letter dated October 16, 2017, informed Gilbert that her employment with Kroger was terminated for "just

---

[15] Gilbert indicated during her deposition that she received a different document during the meeting because "nothing about Jimmy [Ratcliff] ever got mentioned, nothing." See Gilbert Dep. at 83. Gilbert testified that she had a copy of the original document she received at her home. See id. at 83. No such document has been provided to the Court.

[16] The Constructive Advice Record describes Gilbert's behavior as follows: "On Oct 3 Ebony went off on Jacob using extreme profanity (racist, idiot, stupid, dumbass autism mother f*cker) on Oct 7 Ebony double fisted Jimmy and said 'f*uck you.' Ebony has created a very hostile work environment and [is] making entire team very uncomfortable. They do not know what her next move is and feel very threatened." See Record Document 16-7 at 2.

[17] The statement provided by Jarvis Granville is as follows: "I was on break and I heard a commotion coming down [the] sidewalk it was Ebony, Barry [Underwood] and Mr. McNeil coming down sidewalk. Ebony was hollering and cursing at Mr. McNeil telling him to F hisself (sic), F Mrs. Darlene and Barry was trying to get her to leave but she kept on all the way to the parking lot. Mr. McNeil came back in the store." See Record Document 16-7 at 6.

cause" effective October 13, 2017, the last day she worked at the store. See Record Document 16-8.

On April 20, 2018, Gilbert filed a charge of pregnancy discrimination against Kroger with the Equal Employment Opportunity Commission ("EEOC"), and received a right to sue letter dated March 12, 2019. See Record Document 1 at ¶¶41-42.[18] Gilbert filed the instant lawsuit on April 17, 2019, and asserts claims under the PDA and the LEDL. Gilbert alleges that Kroger denied her a reasonable accommodation, which constitutes disparate treatment under the PDA and LEDL because Kroger accommodated others similar in their ability to work. See id. at¶52. Gilbert also alleges that she suffered an adverse employment action in retaliation for communicating with human resources about the denial of her request for a reasonable accommodation. See id. at ¶53.[19] Kroger denies these allegations, maintains that Gilbert was terminated for cause, and moves for the dismissal of all of her claims. See Record Document 5; Record Document 16.

**SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20] Summary judgment is appropriate when the

---

[18] Neither party has provided the Court with a copy of the EEOC charge. Plaintiff's complaint indicates that her EEOC charge contained allegations of discrimination and retaliation on the basis of race, color, and sex. See Record Document 1 at ¶41. Gilbert's complaint does not contain a claim on the basis of race. The Court will limit its analysis based to the claims asserted in the complaint.

[19] Gilbert also requests medical expenses from her back injury as part of her damages related to her discrimination claim. See Record Document 1 at ¶56. A separate claim based on this injury was not included in her complaint.

[20] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment

9

pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. See Celotex, 477 U.S. at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion"). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor. See Little, 37 F.3d at 1075.

---

motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

## LAW AND ANALYSIS

**I.     Pregnancy Discrimination Act / Louisiana Revised Statutes § 23:342** [21]

The PDA builds upon Title VII's prohibition against sex discrimination and makes Title VII applicable to discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." Young v. United Parcel Serv., Inc., 575 U.S. 206, 210, 135 S.Ct. 1338, 1343 (2015). The PDA mandates that employers treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." Id. (citing 42 U.S.C. § 2000e(k)). A discrimination claim under the PDA is analyzed in the same manner as other Title VII discrimination claims. See id. at 210-211; Fairchild v. All Am. Check Cashing, Inc., 815 F.3d 959, 966 (5th Cir. 2016). A plaintiff can prove pregnancy discrimination by either (1) direct evidence that a workplace policy, practice, or decision relied expressly on a protected characteristic, or (2) the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). See Young, 575 U.S. at 213.

---

[21] "Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes." Smith v. Amedisys Inc., 298 F.3d 434, 448 (5th Cir. 2002). As such, this Court will consider Gilbert's federal and state law claims concurrently.

### A.   Reasonable Accommodation

Gilbert claims that Kroger discriminated against her by not providing her with a reasonable accommodation, which she alleges constitutes disparate treatment. See Record Document 1 at ¶52. A pregnant worker may establish a prima facie case under the PDA by showing that (1) she belongs to a protected class, (2) she sought an accommodation, (3) the employer did not accommodate her, and (4) the employer did accommodate others similar in their ability or inability to work. See Young, 575 U.S. at 229. Kroger argues that Gilbert has failed to provide an appropriate comparator. See Document 16-1 at 15-17. Kroger also notes that it did, in fact, ultimately provide Gilbert with an accommodation by changing her schedule. See id. at 8.

Upon review of the record, the Court finds that Gilbert has failed to identify a comparator with a similar ability or inability to work that received an accommodation when she did not. Kroger mentions a potential comparator in its brief in support of dismissal. See id. at 16-17. However, Gilbert's opposition brief does not identify a comparator who did receive an accommodation. Without a comparator, Gilbert cannot establish a prima facie case of discrimination based on an alleged failure to provide a reasonable accommodation. Accordingly, Gilbert's discrimination claim based on the lack of a reasonable accommodation must be dismissed.

### B.   Plaintiff's Termination

Gilbert also alleges that Kroger discriminated against her due to her pregnancy when she was terminated from her employment. To establish a prima facie case, Gilbert must show that (1) she belongs to a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) other similarly situated employees were treated more favorably. See Landry v. Potter, 182 F. App'x 303, 304 (citing Okoye v. Univ. of Tex. Houston

12

Health Sci. Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001)). Kroger does not dispute that Gilbert was qualified for her position, a member of a protected class, or that she suffered an adverse employment action. See Record Document 16-1 at 15. Thus, only the fourth factor is at issue in this case.

To properly plead a prima facie case, Gilbert must demonstrate that similarly situated employees outside of her protected class received more favorable treatment under nearly identical circumstances. See Turner v. Kansas City Southern Ry. Co., 675 F.3d 887, 893 (5th Cir. 2012). Nearly identical circumstances exist when the comparator employee held the same or similar job responsibilities, had the same supervisor, and had comparable violation histories. See id. While each employee's record need not contain the identical number of infractions, the records must be comparable. See Lee v. Kansas City Southern Ry. Co., 574 F.3d 253, 261 (5th Cir. 2009).

Gilbert offers the following individuals as comparators: Veronica, Porkeshia, Ratcliff and Echols. See Record Document 18 at 13. Each of the individuals worked in the seafood department and reported to the same manager. See id. First, Gilbert argues that she was treated less favorably than Veronica or Porkeshia because although all three of them were involved in an "ongoing feud," she was terminated while Veronica and Porkeshia were allowed to transfer to another store. See id.[22] The Court finds that Veronica and Porkeshia cannot serve as proper comparators because the dispute between Veronica, Porkeshia, and Gilbert came to a head in April 2017, at least two months before Gilbert informed Kroger of her pregnancy. All three women were treated the same at that time and were each required to sign Kroger's Workplace Violence policy. See Gilbert Dep. at 50-51. Most importantly, however, the record reflects that

---

[22] Veronica and Porkeshia each requested a transfer. See Joice Dep. at 18. Gilbert never requested a transfer. See id. at 19.

Gilbert's termination occurred after she had several additional confrontations with other coworkers. There is no evidence in the record of Veronica and Porkeshia's disciplinary records for violations occurring after April 2017. As such, they are not comparable as similarly situated employees.

Next, Gilbert suggests that she was treated less favorably than Ratcliff. See Record Document 18 at 14. As noted above, Gilbert and Ratcliff had an altercation while working in the seafood department and Ratcliff allegedly pushed a trashcan that Gilbert claimed to have hit her stomach. See id. Gilbert argues that management watched video footage of the incident, but Ratcliff was not terminated or reprimanded for the incident. See id. In contrast, Gilbert notes that when she made a "double-fist" motion towards Ratcliff it was used as one of the reasons for her termination. See id. Gilbert has presented no evidence of Ratcliff's disciplinary history other than her personal recollection of the incident with the trashcan. Without Ratcliff's disciplinary history, Ratcliff cannot serve as a similarly situated comparator. As noted above, Gilbert signed a Workplace Violence Policy in April 2017, and was told that she was being given her last chance. There is no evidence before the Court that Ratcliff had any recorded prior disciplinary history with Kroger or that he was given a similar last-chance warning prior to the trashcan incident.

Finally, Gilbert argues that she was treated less favorably than Echols after their altercation in October 2017. Gilbert describes their altercation as "having words back and forth" during which she alleges that Echols made a reference to "picking cotton" and called Gilbert a "racist." See id. As noted above, Gilbert's coworkers reported that Gilbert called Echols a "racist" and a "dumbass autism motherf*ucker." See Record Document 16-7 at 9. Once again, Gilbert has provided no evidence of Echols's official disciplinary history with Kroger. Without

Echols's disciplinary history the Court cannot determine whether he was similarly situated to Gilbert, who had previously received a last chance warning from Kroger regarding her behavior.

Based on the above, Gilbert is unable to establish a prima facie case of discrimination based on her termination. Accordingly, Gilbert's pregnancy discrimination claim related to her termination must be dismissed.

## II.     Retaliation

Gilbert has also alleged that Kroger terminated her employment in retaliation for her complaints to human resources regarding her request for a reasonable accommodation. See Record Document 1 at ¶¶57-64. Employers are prohibited from taking adverse employment actions against an employee for opposing an unlawful employment practice. See 42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) a causal link existed between the protected activity and the adverse action. See Baker v. Am. Airlines, Inc., 430 F.3d 750, 754 (5th Cir. 2005); Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 657 (5th Cir. 2012). If a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to offer a "legitimate, nonretaliatory reason for the adverse employment action." Royal v. CCC & R Tres Arboles, LLC, 736 F.3d 396, 400 (5th Cir. 2013). Once provided, the burden shifts back to the plaintiff to demonstrate a conflict in substantial evidence that the proffered reason is actually pretext for retaliation and that the adverse employment action would not have occurred "but-for" the employer's retaliatory motive. See Garcia v. Prof. Contract Servs., Inc., 938 F.3d 236, 243 (5th Cir. 2019).

Kroger does not dispute that Gilbert engaged in protected activity or that she was terminated. However, Kroger argues that Gilbert cannot establish her prima facie case of

15

retaliation because there is no causal link between the two. See Record Document 16-1 at 21. Gilbert argues that there is a causal connection because she made several complaints regarding the lack of a reasonable accommodation to management and to human resources, and despite Kroger's knowledge of her request, she was suspended and terminated shortly thereafter. See Record Document 18 at 21-22.

A temporal proximity between protected activity and the alleged retaliation "may provide the causal connection required to make out a prima facie case of retaliation." Swanson v. Gen. Serv. Admin., 110 F.3d 1180, 1188 (5th Cir. 2007); Jones v. Robinson Prop. Grp., L.P., 427 F.3d 987, 994-95. In this case, the evidence indicates that Gilbert engaged in protected activity within weeks of her termination. As such, the Court finds that the close temporal proximity is sufficient, and Gilbert has met her prima facie case.

However, Kroger has offered a legitimate nondiscriminatory reason for Gilbert's termination. Kroger's official letter of termination informed Gilbert that she was being terminated for "just cause" based on information discovered during its investigation of her suspension. See Record Document 16-8. McNeil testified that Gilbert was terminated because she was a violent person and engaged in gross misconduct. See McNeil Dep. at 38. Kroger also notes that Gilbert engaged in violent/aggressive behavior after she signed Kroger's Workplace Violence Policy. See Record Document 16-7 at 6-11. The behavior includes Gilbert's altercation with Echols as well as her admitted use of a "double-fist" gesture towards Ratcliff.

The burden shifts back to Gilbert to establish that Kroger's proffered reasons are pretextual and retaliation was the "but for" cause for her termination. See LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 388-89 (5th Cir. 2007). To meet this burden Gilbert must show that her termination would not have occurred "but for" Kroger's retaliatory motive. See Feist v. Louisiana, Dept. of Justice, Off. of Atty. Gen., 730 F.3d 450, 454 (5th Cir. 2013).

16

Stated differently, Gilbert must prove by a preponderance of the evidence that Kroger did not fire her for the reasons stated, but in retaliation for her complaints regarding her request for a reasonable accommodation. See Strong v. University Healthcare System, LLC, 482 F.3d 802, 806 (5th Cir. 2007).

Gilbert argues that pretext may be established because her termination occurred only three days after her last meeting with Joice where her request for a reasonable accommodation was discussed. As to the timing of the meeting, the Court notes that temporal proximity alone is insufficient to establish "but for" causation. See id. at 808. Gilbert also argues that pretext may be established because Joice did not address her alleged altercations with Echols and Ratcliff during the meeting. See Record Document 18 at 23. Kroger argues that Gilbert has not provided any evidence that the investigation into her misconduct had been completed at the time of her meeting with Joice. See Record Document 19 at 7. The Court finds that the alleged lack of discussion of Gilbert's conduct during the meeting is not sufficient to establish pretext. The record does not provide a reason as to why Gilbert's conduct was not discussed. As such, Gilbert's assertion that the lack of discussion establishes pretext is mere speculation. It could be that the investigation into Gilbert's conduct was not concluded at the time of the meeting as Kroger suggests. It is also possible that Joice may have intentionally separated discussion of Gilbert's reasonable accommodation requests from her conduct in anticipation of litigation. The evidence simply does not provide the answer. The Court will not infer an insidious motive from Joice's lack of discussion of Gilbert's conduct when no evidence has been presented to suggest it existed.

Gilbert also argues that McCall and McNeil made comments about her pregnancy, which may be used to establish pretext. See Record Document 18 at 23. McCall allegedly made the most serious comment, stating that Gilbert used to be a good worker, but she should go ahead

and quit and take care of her family so she wouldn't have to stress about coming into work during a high-risk pregnancy. See Gilbert Dep. at 99-100. For a comment to be probative in a discrimination suit the alleged discriminatory statement must be made by a relevant decision maker. See Nichols v. Loral Vought Systems Corp., 81 F.3d 38, 41-42 (5th Cir. 1996). Gilbert has provided no evidence that McCall was a decision maker regarding her termination. As such, McCall's comments are not probative.

Gilbert also claims that McNeil commented on her pregnancy by asking her when she planned on quitting her job on more than one occasion. See Gilbert Dep. at 101. She also claims that McNeil asked her for a doctor's note specifying the amount of weight she should not lift. See id. Gilbert also testified that when she requested maternity leave McNeil told her that she needed to work to be paid. See id. McNeil's request for a doctor's note with a specific lifting restriction does not appear to be discriminatory in any way, but rather, a request for more information about her condition. As for Gilbert's request for paid maternity leave, the Court has already noted that no evidence exists that Kroger offered paid maternity leave as a benefit or whether Gilbert was qualified to receive that benefit. The Court is left with McNeil's alleged inquiry as to when Gilbert planned on quitting her job. Kroger does not dispute that McNeil was a decision maker regarding Gilbert's termination, but argues that the comment is insufficient to establish pretext. The Court agrees. This statement is certainly based on an outdated stereotype about a woman's ability to continue working while raising a family, but it does not demonstrate a retaliatory motive. See Wallace v. Methodist Hosp. System, 271 F.3d 212, 224 (5th Cir. 2001).

The Court finds that Gilbert has failed to demonstrate that she would not have been terminated "but for" her protected activity. Gilbert's employment history with Kroger includes several altercations with her coworkers in the months leading up to her termination. She confirmed in her deposition that she had an altercation with Ratcliff, although she disputes the

exact date it occurred. She also confirmed that she had an altercation with Echols behind the seafood counter, although she disputes who instigated the situation. Both altercations occurred after she was warned about her behavior and she signed and acknowledged her understanding of Kroger's Workplace Violence policy. Likewise, Gilbert does not dispute that several of her coworkers reported to Kroger that she created a hostile work environment. Based on this information, the Court cannot find that there is a conflict in substantial evidence on the question of whether Kroger's proffered reason for her termination is pretextual. The evidence in the record suggests the contrary. An employer is not uniformly prevented from making necessary personnel decisions to remove a poorly performing or severely disruptive employee simply because that employee engaged in protected activity. See Strong, 482 F.3d at 808. In light of the above, the Court finds that Gilbert has failed to establish that her termination would not have occurred "but for" her protected activity. Accordingly, Gilbert's retaliation claim must be dismissed.

## CONCLUSION

Based on the foregoing reasons, Kroger's Motion for Summary Judgment (Record Document 16) is hereby **GRANTED**. All of Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED**, this 19th day of May, 2020.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE